The defendant, with one Baldy Gaither, was indicted at the Fall Term, 1872, of IREDELL, for the murder of one Margaret Seamon. They served in their trials, and on proper affidavits the cases of both were removed to Wilkes County.
Upon the trial of the defendant, who was first tried, the following facts appeared in the evidence offered by the State:
The deceased and her mother lived on or near to a public road leading from Statesville, by one Dr. Angel's, their house being about three-quarters of a mile south of the doctor's. The homicide was (248) committed on the margin of this road, one-quarter of a mile south of the house of the mother, on the night of 2 April, 1872, by two or more cuts on the neck of the deceased with a knife — her head being nearly severed from the body. Her clothes, when the body was found, were raised to her abdomen. The deceased had a bad general character for lewdness, and at the time of her death was pregnant of a white child, and in the seventh month of her gestation. There was evidence, that in passing, the prisoner associated with the deceased and her mother on terms of social equality, but no evidence of any *Page 177 
criminal cohabitation. The prisoner lived with Dr. Angel, as a common servant, and is a colored boy of some 22 or 23 years of age.
On the afternoon of 2 April (the night of the homicide), the prisoner was ploughing near the house of his employer, and at the same time one Caswell Dalton, another colored boy, was at work on an adjoining farm, within call of the prisoner. The prisoner called Dalton and told him, that he would come to his, Dalton's, house that night. Dalton lived with his brother Anderson. About half-past 8 o'clock on the same evening, the prisoner, dressed in his best clothes, started from Dr. Angel's to go to Anderson Dalton's, and reached there about half-past 10 o'clock. He called Caswell, who met him a short distance from the house, where some casual conversation occurred; they then went near the steps of the house and sat down. In the conversation then had, the prisoner, in a whispered communication, informed Caswell, that he had that night killed Margaret Seamon. The witness, Caswell, expressed his surprise and protested that he, the prisoner, could not have the heart to do such a thing. The conversation was heard in part by a colored female visitor, but to her the import was unintelligible as an entire communication. The prisoner remained at Dalton's until the next morning. The distance from the house (249) of Dr. Angel to the house of Anderson Dalton, and from the latter to the place of the murder, is about the same, each being about three-quarters of a mile. The distance from Dr. Angel's to the place of the murder is one mile. The places from Dr. Angel's to the place of the murder is one mile. The places named form a triangle, with a distance of one mile on the road from the house.
It was also in evidence that the body of the deceased was first discovered about 9 o' clock the next day, 3 April. An inquest was held by the corner, and witnesses were examined, but no material revelations were made in their testimony. However, several persons were on the alert, and in consequence of their vigilance, some three or four weeks after the inquest, the prisoner was arrested on suspicion and had an examination before a Justice's Court. The Justices after examining all the evidence, committed the prisoner for trial. After his commitment, the prisoner being in custody, with his arms so confined that he could not conveniently use them to feed himself, a colored girl who also lived at Dr. Angel's brought him his breakfast, and waited on him while he was eating. During that time she remarked: "If he had listened to her advice and not gone to that house that night, you would not be in this fix. This will kill your mother. You will be carried off and I shall never see you again." His reply was: "It is too late now, it can't be helped." Another witness heard the conversation, but the words: "Why did the damned bitch tell that lie," were added, in his testimony. The defendant excepted to this evidence, for the *Page 178 
reason that the prisoner was in custody, and his arms tied. It was received by the Court.
There was further evidence tending to prove, that on the Saturday night before the murder the prisoner had threatened to kill the deceased, to prevent her from swearing her child. Similar threats had been made by him against those who charged him with the (250) murder.
The Court refused to instruct the jury, asked by the prisoner's counsel, that they ought not to convict on a simple confession; for the reason, that if they believed in the truth of the confession, it was their duty to convict; and because in this case, there was much corroborating testimony, and the proposition was a mere abstraction.
The jury found the prisoner guilty. Motion for a new trial; motion overruled. Judgment, and sentence, from which the prisoner appealed.
We have examined the record with the care which the importance of the case demands, and find no error which entitles the prisoner to a venire denovo.
The chief ground assigned for error in this Court is found in the response of his Honor to a prayer for instructions; in which he states, that he refused to instruct the jury that they ought not to convict on a simple confession, for the reason that if they believed in the truth of the confession, it was their duty to convict; and secondly, because in this case there was much corroborating testimony, and the proposition was a mere abstraction.
(251) We think his Honor was correct in refusing to charge a proposition, which, to use his own language, was a mere abstraction. It was his duty not only to refuse the prayer of the prisoner, but also to call the attention of the jury to the fact that there were circumstances which the State relied upon, as corroborating the theory of the prisoner's guilt.
We do not think that the charge, fairly construed, intimates any opinion as to the weight which the jury should give to the corroborating testimony.
PER CURIAM. No Error.
Cited: S. v. Hardee, 83 N.C. 622. *Page 179